J-A13018-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO S.G.P., A MINOR | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.P., MOTHER | : : : : : : : : : | No. 406 EDA 2022 |

Appeal from the Decree Entered January 3, 2022
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
A2021-0042

BEFORE:  OLSON, J., DUBOW, J., and KING, J.

MEMORANDUM BY DUBOW, J.:                    **FILED AUGUST 1, 2022**

K.P. ("Mother") appeals from the Decree entered December 30, 2021, by the Court of Common Pleas of Lehigh County, involuntarily terminating her parental rights with respect to S.G.P. ("Child"), born in August 2017. Because the record supports the decision of the Orphans' Court, we affirm the Decree.

**Background**

We glean the following factual and procedural history from the Orphans' Court's Opinion and the certified record.  Mother, who was twenty-two years old at the time of the termination hearing, has struggled with depression and drug abuse throughout Child's life and substantially depended on Child's Maternal Grandmother ("Grandmother") to meet her needs as well as Child's

needs.[1]  On August 1, 2019, Upper Saucon Police arrested Mother for retail theft, took emergency custody of then two-year-old year old Child, and notified Lehigh County Office of Children and Youth Services ("CYS"). That same day, CYS received a Childline child abuse report that Child had a burn on his arm.[2] CYS later found the report to be indicated. On August 2, 2019, the Juvenile Court authorized Child's removal from Mother and transferred emergency custody to CYS.  CYS initially placed Child in kinship care,[3] but after the caretaker became ill, CYS placed Child in a foster home on August 22, 2019, where he remains.[4]

After Child's removal from her custody, Mother had no cell phone and no verifiable address. CYS was finally able to connect with Mother through Grandmother and on November 19, 2019, Kayla Szatkowski, the CYS caseworker assigned to Mother's case, met with Mother. At that meeting, Ms. Szatkowski explained that CYS would be referring Mother for drug-screening at Averhealth, reunification services at Salvation Army, and a substance abuse

---

[1] Father is unknown.

[2] The burn, located between Child's elbow and wrist, was in the shape of a rectangle with linear patterns, as if someone had pressed an object with lines onto Child's arm.

[3] CYS declined to place Child with Grandmother because Grandmother had a significant history with Bucks County CYS, including a May 2019 child abuse report indicated against her for chemical burns on Child's upper body.  N.T., 10/4/21, at 43.

[4] Child's foster parent is an adoptive resource.

evaluation. She also instructed Mother how to access the services. Mother had her first visit with Child on November 20, 2019.

On November 21, 2019, the Juvenile Court conducted an adjudication and dispositional hearing. Although CYS had provided notice of the hearing to Mother, she did not appear. Instead, Grandmother attended. On November 26, 2019, the Juvenile Court adjudicated Child dependent with a goal of reunification and ordered Mother to (1) cooperate with reunification services; (2) obtain and maintain appropriate housing and a legal income; (3) attend visits with Child; (4) undergo a drug and alcohol evaluation and comply with services; and (5) submit urine screens to demonstrate sobriety.

In December 2019, Mother was again arrested. She was released from incarceration in January 2020 into a substance abuse inpatient rehabilitation program at White Deer Run. She completed the program and White Deer Run released her to the Renewal Center, a sober living house in Johnstown on February 27, 2020. Mother left the Renewal Center on March 13, 2020, later informing CYS that the house was not close enough to Child.

Mother restarted bi-weekly visits with Child on March 23, 2020, which occurred either in-person or virtually, supervised by Stephanie Niemira from the Salvation Army Children's Services.[5] Throughout the case, Grandmother

---

[5] Stefanie Niemira, a visit coach and placement transition services worker from Salvation Army Children's Services, first had contact with Mother on November 27, 2019. Her role was to help connect Mother to drug screening,
*(Footnote Continued Next Page)*

scheduled most of the visits with Child, provided most snacks and drinks, and ensured there were activities for Child during the visits. Mother consistently attended the visits, accompanied often by Grandmother.

Ms. Szatkowski met with Mother in April 2020 and learned that when Mother left the Renewal Center, she had stayed with the father of her younger child.[6]  Soon  thereafter, she began staying with Grandmother at the home of Grandmother's employer.[7] Ms. Szatkowski explained to Mother the goals the Juvenile Court expected her to meet to reunify with Child and provided her with phone numbers. Ms. Szatkowski reminded Mother that Ms. Niemira was there to assist Mother.  Mother, however, declined help from CYS, insisting that she planned to do everything on her own, including getting a job and obtaining treatment for drug and alcohol and mental health at the Penn Foundation.

At the May 21, 2020, dependency review hearing, the court found that Mother had made moderate progress.  The court clarified Mother's goals by

---

outpatient services, and meeting her basic needs such as housing and employment.  She also supervised the visits between Mother and Child.

[6] Mother's younger child was born in 2019.  Mother has cared for the child on her own when the father was at work, but she has not cared for the child for extended periods without other adults around.  CYS received a referral regarding this younger child around September 17, 2021.  N.T. TPR Hr'g, 10/5/21, at 95.  There is no further information in the certified record about the nature of the referral or the outcome.  This child is not a subject of this appeal.

[7] Grandmother was employed as a live-in, home health care aid.

directing Mother to cooperate with CYS, attend to Child's medical needs, complete intensive outpatient drug and alcohol treatment, and demonstrate sobriety by submitting to urine screens at Averhealth. At the November 10, 2020, permanency hearing Mother had a "sickly look," appeared agitated, and yelled at Ms. Szatkowski. N.T. TPR Hr'g, 10/4/21, at 66-67. The Honorable Edward D. Reibman, asked Mother if she was under the influence of substances and Mother admitted that she "probably" was. *Id*. at 67. Ultimately, the court found that, although Mother had attended supervised visits, she had not engaged in court-ordered outpatient substance abuse treatment, had not submitted urinalysis screens, was not employed, and had no legal income. The court, thus, found her to have made minimal progress and to be minimally compliant with the reunification plan.

In March 2021, Ms. Szatkowski visited Mother in Berks County, where she continued to live in the home of Grandmother's employer. Ms. Szatkowski found that Mother "appeared the most appropriate she's been through the life of the case." N.T. TPR Hr'g, 10/4/21, at 71. Mother no longer had "that sickly look" and she was able to have a conversation with Ms. Szatkowski. *Id.* Mother told Ms. Szatkowski that she was engaged in mental health therapy, was on medication, and was attending AA with her sister.

At the May 20, 2021 permanency review hearing, however, the court heard evidence that Mother still had not participated in outpatient substance abuse therapy, and had not submitted to urinalysis at Averhealth. Further,

Mother was still unemployed and living with Grandmother at Grandmother's employer's home. Accordingly, the Juvenile Court found Mother was minimally compliant and had made no progress.

**Involuntary Termination of Parental Rights**

On May 25, 2021, when Child was three-and-a-half years old and had been in his pre-adoptive placement for more than eighteen months, CYS filed a petition to terminate Mother's parental rights to Child based on Mother's inability to make progress on her goals notwithstanding court directives and CYS's efforts to provide her with services.[8] On October 4, and 5, 2021, the Orphans' Court conducted termination of parental rights ("TPR") hearings.[9] CYS presented the testimony of, *inter alia*, Ms. Szatkowski, Ms. Niemira, and Mother as if on cross-examination. The court admitted various exhibits, including Child's dependency orders. Mother, represented by counsel,

---

[8] Two months after CYS filed the termination petition, in July 2021, Mother entered a 30-day substance abuse program. Upon her completion in August 2021, she moved in with her younger child's father and, in September 2021, obtained employment at Amazon. Soon thereafter, she moved into an apartment in Montgomery County. Mother submitted evidence at the termination hearing showing that she signed the lease for the apartment in April 2021. She contended that she did not move in then because she did not want to live alone and that it had "skipped" her mind to tell CYS about the lease. N.T. TPR Hr'g, at 140-43.

[9] By order entered June 14, 2021, the Orphans' Court appointed Child's guardian *ad litem* in the dependency proceedings to represent him as his counsel in the termination matter, finding there was no conflict of interest between Child's best and legal interests.

presented the testimony of Grandmother and the court admitted Mother's proffered exhibits, including a copy of her April 2021 lease, a paystub from Amazon, and a letter from Creative Health where Mother had just started to receive mental health treatment.

At the conclusion of the testimony, the Orphans' Court took the matter under advisement. On December 30, 2021, the court entered a Decree accompanied by a memorandum terminating Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).

Mother filed a timely Notice of Appeal and Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court directed this Court to the Memorandum filed December 30, 2021.

**Issues**

Mother now raises the following issues for our review:

[1.] **Finding of Termination**. Parental [r]ights are terminated only if there is clear and convincing evidence. Here, there is a lack of evidence to show that the conditions that led to removal of [Child] still exist, the parent has refused or failed to perform parental duties, and the causes of the removal will not be remedied. With a lack of clear and convincing evidence for involuntary termination, did the [Orphans' Court] err in involuntarily terminating [Mother's] parental rights?

[2.] **Statutory Grounds Met**. Parental rights can only be terminated if there is clear and convincing evidence of one of the statutory grounds. Here, [M]other completed two separate inpatient drug and alcohol programs, executed drug screens with negative results, obtained housing and employment, and, on her own, sought out and obtained mental health treatment. She completed all court directives. When there is a lack evidence [*sic*] that [M]other's conduct satisfies the statutory language, can she have her parental rights terminated?

- 7 -

Mother's Br. at 4.

**Standards and Applicable Law**

Our standard of review is well-settled. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). Appellate courts must accept the Orphans' Court's findings of fact and credibility determinations if the record supports them. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). An appellate court may disturb a ruling supported by competent evidence in the record only upon discernment of an error of law or abuse of discretion. *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123-24.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the

care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." ***In re Adoption of C.M.***, 255 A.3d at 358. Termination of parental rights has "significant and permanent consequences for both the parent and child." ***In re Adoption of L.A.K.***, 265 A.3d at 591. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re Adoption of C.M.***, 255 A.3d at 359 (***quoting Matter of Adoption of Charles E.D.M., II***, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by Section 2511 of the Adoption Act. In addressing petitions to terminate parental rights involuntarily, the Adoption Act requires the Orphans' Court to conduct a bifurcated analysis. ***See*** 23 Pa.C.S. § 2511(a) and (b). "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." ***In re Adoption of C.M.***, 255 A.3d at 359; ***see also*** 23 Pa.C.S. § 2511(a)(1)-(11). If the Orphans' Court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, the court then must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

**Section 2511(a)(2) and (b)**

While the Orphans' Court here found that CYS met its burden of proof under multiple subsections of 23 Pa.C.S. § 2511(a), we need only agree with the court's decision as to any one subsection of Section 2511(a) as well as Section 2511(b), to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We focus our analysis on Section 2511(a)(2) and (b).

Section 2511(a)(2) provides that the rights of a parent may be terminated if the petitioner proves by clear and convincing evidence "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *Interest of D.R.-W.*, 227 A.3d 905, 912-13 (Pa. Super. 2020) (citation omitted). Grounds for termination under subsection (a)(2) include more than affirmative misconduct and acts of refusal; it also includes parental incapacity. *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Thus, sincere efforts to perform parental duties may still be insufficient to remedy an incapacity. *In re Z.P.*, 994 A.2d at 1117. This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where

disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *Id.*

"Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re Adoption of A.H.*, 247 A.3d at 443. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re Z.P.*, 994 A.2d at 1118 (citation omitted). "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs." *In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (internal citations omitted).

If a court determines that CYS has proven the elements of subsection (a), the court shall then "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). That section further provides that "[t]he rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." *Id*.

**Legal Analysis**

With respect to Section 2511(a)(2), Mother argues that CYS did not prove she had a drug problem, and alternatively, even if she had a drug

problem, she successfully completed two substance abuse programs and never provided CYS with a positive drug screen. Mother's Br. at 24. She argues that she addressed her mental health struggles on her own initiative by obtaining treatment, despite CYS's failure to make her mental health a goal or to provide assistance. *Id.* She also avers that she obtained housing in April 2021 and employment in September 2021. *Id.* In her view, she remedied the causes of her incapacity and the trial court erred in finding otherwise. *Id.* at 25.

In addressing Section 2511(a)(2), the Orphans' Court emphasized that after Child had spent over twenty-two months in foster care, Mother was still unable to resume parental duties. Orphans' Ct. Op., 12/30/21, at 13. The Orphans' Court offered the following analysis outlining Mother's incapacity and refusal:

> Mother denied having used illicit substances since [2016] and claimed that her two 30-day in-patient admissions for drug and alcohol were simply to "clear the air" with CYS, which the [c]ourt did not find credible - especially in light of her admission during a dependency hearing conducted by the undersigned on November 9, 2020, in which Mother admitted that if she were to go to Averhealth that day to submit to urinalysis she would likely produce a positive screen because the frustration of dealing with her CYS caseworker would make anyone turn to drugs or alcohol. Mother denied making those statements during the hearing on the involuntary termination of her parental rights.
>
> In this case, it is not entirely clear why Mother was unmotivated for such a lengthy period to do what was necessary to resume parental care of [Child]. It could have been issues related to addiction or mental health issues or some combination of the two. Numerous witnesses testified as to Mother's poor physical appearance (looking sickly and fatigued and having a pallor to her

skin) and strange behavior (laughing when no one was talking, staring off into space, having difficulty engaging in conversation, and generally seeming disconnected from others and from the present).

Additionally, [CYS's] case in chief was fraught with testimony of situations in which Maternal Grandmother was acting toward [Child] in the role that an interested parent would, and, moreover, that Maternal Grandmother took care of nearly all of Mother's needs, including making all her appointments, arranging for her visitation with [Child], providing for Mother financially, and arranging for Mother's mental health and substance abuse interventions.

It is not clear that this 22-year-old [m]other is capable of taking care of herself independently. What is clear is that Mother was not capable of stepping up to provide the care and nurturance that [Child] needs from the adult(s) who assume a parental role in his life. Mother was not even capable of this for a finite short period in the visits she attended.

*Id*. at 14 n.14 (paragraph breaks supplied). The Orphans' Court applauded Mother's "very recent turn in the right direction," but determined it was "too speculative to project that she will be able to resume parental duties in a reasonable period of time after such a lengthy period of minimal compliance and no progress." *Id.* at 14. Accordingly, it concluded CYS proved the elements of subsection (a)(2).

Our review of the record supports the Orphans' Court's findings regarding Mother's incapacity and refusal. The record is replete with testimony from Ms. Szatkowski and Ms. Niemira regarding Mother's refusal or inability to engage in services except visitation throughout the majority of the case. Further, Mother alternated between "hostile" or withdrawn, and was not

forthcoming about her struggles. *See* N.T. TPR Hr'g, 10/4/21, at 97; N.T. TPR Hr'g, 10/5/21, at 31, 34-35.

Even after Mother's demeanor and cooperation changed in May and during the summer of 2021, the trial court properly found that it was too little too late. Also, Mother still lacked the capacity to provide care, stability, and security for Child because Mother still struggled to care for herself. She was still dependent on others. As Ms. Szatkowski explained, "mentally, it's like [Mother] was a much younger child. Maternal Grandmother does everything for her. And even though she's more engaged with [Child], she still needs to be coached after two years of being with the visit coach of, okay, go play with [Child] now. Do this. He wants to play with this. Otherwise, she would . . . sit there and she really wouldn't initiate the contact." N.T. TPR Hr'g, 10/4/21, at 117; *see also* N.T. TPR Hr'g, 10/5/21, at 10-11 (where Ms. Niemira describes Mother's minimal progress with interacting with Child and assisting him in regulating his emotions).

Throughout Child's over two years in foster care, CYS was never able to increase Mother's visits to unsupervised, let alone proceed towards reunification. N.T. TPR Hr'g, 10/4/21, at 125; *see also* N.T. TPR Hr'g, 10/5/21, at 27 (where Ms. Niemira opines that Mother still could not care for Child in an unsupervised setting due to Mother's lack of independence and need for her own support). Thus, while Mother finally started making progress in some areas of her life shortly before the hearing on the termination petition,

the Orphans' Court was within its discretion to conclude it could not rely on such progress after such a long period of instability. ***See In re Z.P.***, 994 A.2d at 1118.

Furthermore, some of the supposed progress Mother points to in her brief is not borne out by the record. Mother may have rented an apartment, but instead of living there, she opted to stay with Maternal Grandmother and her younger child's father because she did not like living alone. This situation created potentially volatile and unstable situations and demonstrates Mother's lack of maturity to provide care, security and stability for Child.

Similarly, although Mother may never have tested positive for drugs while CYS had custody of Child, Mother fails to mention that she refused to attend court-ordered urine screenings until one to two months before the hearing on the termination petition.

The certified record supports the Orphans' Court's factual findings and the court acted within its discretion in concluding that CYS proved the elements of Section 2511(a)(2).

### 23 Pa.C.S. § 2511(b)

Mother argues that termination of her parental rights is not in Child's best interests. She argues that she shares a strong bond with Child because Child calls her "mommy" and "mama," Child' is happy to see Mother at visits, and Child is upset when Mother is not at visits. Mother's Br. at 35. Mother posits that Child was hurt by Mother's absence while Mother was in

rehabilitation centers and, therefore, Child would hurt if the court severed their bond through termination of her rights. *Id.* Mother also argues Mother is in a good place in her life, Child is safe with her, and she is a "stable and fruitful source" of Child's developmental, physical, and emotional needs. *Id.* at 35-36.

Initially, we note that Mother failed to include a separate argument concerning Child's needs and welfare and Section 2511(b) in her statement of questions presented as required by Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."). She also makes conclusory statements without any citation to the record in violation of Pa.R.A.P. 2119(c). Accordingly, she risks waiver. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017). Nevertheless, we will address her argument.

Section 2511(b) requires the Orphans' Court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 628 (citation and quotation marks omitted). Our Supreme Court has made clear that Section 2511(b) requires the trial court to consider the nature and status of bond between a parent and child. *In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993). To the extent there is a bond, the trial court must examine whether

termination of parental rights will destroy a "necessary and beneficial relationship," thereby causing a child to suffer "extreme emotional consequences." *Id.* at 484-85.

"While a parent's emotional bond with his or her child is a major aspect of the [s]ubsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014). "In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id*. In determining needs and welfare, the court may properly consider the effect of the parent's conduct upon the child and consider "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights." *In the Interest of L.W.*, 267 A.3d 517, 524 (Pa. Super. 2021).

Furthermore, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an

obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In finding that termination of Mother's rights best serves Child's needs and welfare, the Orphans' Court determined that severing the bond would not cause a "substantial" effect, insomuch as Child's "bond with Mother is best characterized as pleasant but not necessary to his well-being." Orphans' Ct. Op., 12/30/21, at 15. Child has "a positive connection with Mother at the visits, but it is clear that [Child's] primary bond, at this point, is with his foster parent, not with Mother." *Id.* In Mother's parental absence, Child's foster mother has provided him with love and structure and consistently met his needs. *Id.* at 16.

Upon review, we conclude the record supports the Orphans' Court's findings that Mother at best has the type of relationship that a friend would have with a child and not someone whom the Child relies upon for safety, security and care on daily basis. *See, e.g.*, N.T., 10/4/21, at 80-85 (Ms. Szatkowski's testimony opining Child loves Mother but is not bonded to her, versus Child's strong bond and thriving with his pre-adoptive foster parent); N.T., 10/5/21, at 21, at 54 (Ms. Niemira's testimony that Child and Mother have a "very minimal bond"). As such, the Orphans' Court was within its discretion to prioritize the bond Child has forged with his foster parent through her daily and stable care over his bond with Mother maintained during supervised visits. *See In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008).

Furthermore, as discussed above, Mother's stability is still shaky. Child has endured instability and burn injuries while in Mother's care, followed by two years in foster care while Mother attempted to address her drug abuse, her personal stability issues, and her parenting ability. The Orphans' Court properly exercised its discretion to conclude that termination of Mother's rights would best meet Child's security and safety needs. *See M.M.*, 106 A.3d at 119. Accordingly, no relief is due with respect to Section 2511(b).

Based on the foregoing, we conclude that the Orphans' Court did not err or abuse its discretion by terminating Mother's parental rights. Thus, we affirm the Decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/1/2022